**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:11CV318 |
| | ) | |
| $115,471.00 in U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. #21] in its civil in rem action for the forfeiture of defendant currency. Plaintiff United States of America ("the Government") argues that it has met its burden of showing by a preponderance of the evidence that the defendant currency is forfeitable. (Pl.'s Br. in Supp. of Summ. J. [Doc. #22].) Claimant Jose Joel Torres Gonzalez disputes such a conclusion and also seems to argue that, even if the Government had met its burden, he is an innocent owner of the defendant currency. (Br. in Opp'n to Pl.'s Mot. for Summ. J. [Doc. #28].) For the reasons explained herein, the Government's Motion is granted.

I.

As a preliminary matter, the Government has submitted two declarations, among other exhibits, in support of its Complaint and Motion, one from Kevin Cornell (Cornell Decl., Apr. 25, 2011 [Doc. 1-1]), a Deputy Sheriff in the Guilford County Sheriff's Office and a Task Force Officer with the Drug Enforcement Administration, and one from Eric Stanley (Stanley Decl., Feb. 6, 2017 [Doc. #22-

2]), a Master Corporal in the Special Operations Division/Canine Unit of the Guilford County Sheriff's Office. While Corporal Stanley's declaration is based solely on his personal knowledge as a responding canine officer, (see Stanley Decl. ¶¶ 2-5), Deputy Cornell's declaration is based on his "personal knowledge and experience and on information provided by officers who participated in the events described [in the declaration]", (Cornell Decl. ¶ 2 (emphasis added)).

Despite Deputy Cornell's attesting to factual details, he does not state that he was a participant in any of the activities he describes, nor does he appear to have been a participant. (See id. ¶¶ 3-23.) Instead, these details are likely those to which he referred as having been provided by officers who did participate in the relevant events. The only portion of his declaration which is based on his personal knowledge and experience is his description of drug traffickers, drug sales, and related cash. (See id. ¶ 19; see also ¶ 23 (giving opinion as to probable cause).) Any other statements are hearsay to which the Government has not argued an exception applies.

Accordingly, in its presentation of the undisputed facts, the Court will not use the hearsay statements in Deputy Cornell's declaration. See United States v. $94,200.00 in U.S. Currency, No. 1:11CV609, 2012 WL 2885129, at *3 n.3 (M.D.N.C. July 13, 2012) (citing United States v. 524 Cheek Rd., 425 F. Supp. 2d 704, 708 n.3 (M.D.N.C. 2006)); United States v. $864,400.00 in U.S. Currency, No. 1:05CV919, 2009 WL 2171249, at *2 n.3 (M.D.N.C. July 20, 2009), aff'd, 405 F. App'x 717 (4th Cir. 2010). Cf. United States v. Currency, U.S.,

$147,900.00, 450 F. App'x 261, 264 n.2 (4th Cir. Oct. 14, 2011) (unpublished) (reviewing the admission of hearsay for plain error and finding none because, prior to the 2000 passage of the Civil Asset Forfeiture Reform Act ("CAFRA"), courts routinely permitted the Government to rely on hearsay evidence in forfeiture proceedings and only one appellate court has since explicitly recognized that hearsay evidence is no longer admissible).

II.

A.

The following undisputed facts are taken from <u>State v. Torres-Gonzalez</u>, 741 S.E.2d 502 (N.C. Ct. App. 2013), unless otherwise noted. In October 2010, Detective Mounce[1], an officer in the Vice Narcotics Division of the Guilford County Sheriff's Department, was working undercover when he was introduced to Ramone Ramirez Blanco, a suspected drug dealer. <u>Id.</u> at 505. Detective Mounce met with Blanco to purchase a small amount of cocaine and later began to inquire about purchasing larger quantities of cocaine. <u>Id.</u> The two set up a deal for November 16, 2010 for the sale of fifteen ounces, or about 425 grams, of cocaine for $18,000. <u>Id.</u> After Detective Mounce arrived at the Belk parking lot at Four Seasons Mall, Blanco also arrived. <u>Id.</u> Gonzalez[2], with whom Detective Mounce had no prior contact, was in the passenger seat. <u>Id.</u> After confirming that

---

[1] Detective Mounce's first name is not provided in the Court of Appeals opinion, nor elsewhere in the materials before the Court.

[2] In his brief in opposition to the Government's motion for summary judgment, the Claimant refers to himself as Gonzalez.

Detective Mounce and another undercover detective had the purchase money,

Blanco told Detective Mounce that he and Gonzalez had to go pick up the cocaine.

Id.

Blanco and Gonzalez then drove to Blanco's home where Gonzalez's vehicle

was parked. Id. at 506. The plan was for Gonzalez to go to his home, get the

cocaine, and then meet Blanco at a nearby Food Lion where Blanco would pick up

the drugs. Id. After Blanco had been waiting at the Food Lion for a period of time,

he called Gonzalez who had people at his house and required Blanco to come there

to pick up the cocaine. Id. While under surveillance, Blanco left Food Lion, drove

to Gonzalez's house, and retrieved the cocaine at which time Gonzalez told Blanco

to return with the money and make sure he was not being followed. Id. Blanco

then called Detective Mounce, and they eventually met at a Home Depot where the

sale of cocaine was completed and Blanco arrested. Id.

While Blanco's possessions were being processed, one of his two cell

phones rang repeatedly. Id. The cell phone number was matched to Gonzalez

whose address was determined to be the same residence Blanco visited to retrieve

the cocaine. Id. That night, law enforcement obtained a search warrant for

Gonzalez's residence which had been under surveillance throughout the application

process. Id. During the execution of the search warrant, law enforcement found

triple-beam scales and "two $100 bills, two cardboard boxes containing a total of

fifteen bundles of money, a paper bag with seven envelopes of money, two

individual envelopes containing more cash, and Defendant's wallet, which

contained $342.  The cash found at the scene totaled $115,371[3]." Id.  According to Gonzalez's son, Joel Gonzalez Lopez, Jr., who observed officers as they conducted the search and seized the money, the money was found in a kitchen cabinet, under the bed in the master bedroom, and from the master bedroom closet. (Lopez Aff. ¶ 7 [Doc. #26].)  Based on Deputy Cornell's training and experience, drug traffickers store proceeds from drug sales in an area that gives them access to the funds for future drug transactions and that they deal in bulk cash in order to conceal their activities and to avoid the creation of a paper trail. (Cornell Decl. ¶ 19.)

Corporal Stanley and his canine partner Bo responded to the residence during the search. (Stanley Decl. ¶ 3.)  Corporal Stanley directed Canine Bo to conduct a narcotics detection sniff of the interior of the residence. (Id. ¶ 4.)  In Gonzalez's bedroom, Canine Bo positively alerted to the presence of an illegal narcotic odor on the left front corner of the bed. (Id.)  After searching the residence, the cash seized was combined and Canine Bo was directed to conduct a sniff of the currency, the result of which was a positive alert to the odor of narcotics. (Id. ¶ 5.)  Gonzalez was found guilty by a jury of felony conspiracy to traffic in cocaine. Gonzalez, 741 S.E.2d at 507.

---

[3] Although the Court of Appeals recounted that the cash totaled $115,371, Gonzalez does not dispute that the amount of currency allegedly forfeitable is $115,471.

B.

Also undisputed is that Gonzalez operated a sole proprietorship, JTG Drywall & Paint, from approximately 2000 until 2010 when he was arrested for the offense described above. (Lopez Decl. ¶ 2.)  From 2005 to 2010, the years for which Gonzalez's joint tax returns were submitted[4], the business had increasingly significant gross receipts and corresponding increasingly significant expenses. (See 2005-2010 Tax Returns [Doc. #22-3] (showing $211,037 in gross receipts and $201,226 in total expenses for 2005; $285,362 in gross receipts and $264,925 in total expenses for 2006; $297,888 in gross receipts and $260,959 in total expenses for 2008; $486,572 in gross receipts and $419,272 in total expenses for 2009; and $915,847 in gross receipts and $831,439 in total expenses for 2010).[5])

JTG Drywall & Paint had many customers, many of which were companies doing repeat business, while some were homeowners. (Lopez Aff.[6] ¶ 8.)

---

[4] Gonzalez did not produce a tax return for 2007.

[5] Gonzalez's tax returns for 2005 to 2010 are also attached as Exhibit 4 to Lopez's affidavit submitted in support of Gonzalez's claim.  Exhibit 4 contains more complete copies of the tax returns by including, for example, Schedule SE, EIC worksheet, and Carryover worksheet.  Because Exhibit 4 was filed conventionally with the Court with no redactions and, but for the additional schedules and worksheets, the Government's copies and Lopez's copies of the tax returns are identical, the Court cites to the Government's electronic and redacted exhibits.

[6] Lopez attests to having always worked with his father as soon as he was able to work and having been active in operating the business. (Lopez Aff. ¶ 2.)  He actively assisted his father with the business's books, records, finances, handling of money, carrying out business, paying employees, and other aspects of the business. (Id. ¶ 3.)  Statements made by Lopez attributable to this personal knowledge are included here.

Companies issued 1099's and "ordinarily" paid by check, while homeowners paid in cash. (Id.)  Gonzalez's "standard practice" was to "[s]ometimes" take the customer's check to his bank, deposit part of it, and cash part of it. (Id. ¶ 9.) "[M]ore frequently," he would cash the check in its entirety at the customer's bank. (Id.)

The business's expenses included vehicle expenses, contract labor, insurance, interest, legal and professional services, office expenses, equipment leases, supplies, taxes and licenses, meals and entertainment, and utilities, the largest of which by far was labor. (See 2010 Tax Return [Doc. #22-3 at 21].) While some employees were paid in cash, (cf. Lopez Aff. ¶ 12 (noting that "all" employees were paid in cash)), thirteen of the approximately twenty employees in 2010 were paid throughout the year by check from an account in the name of Jose J Torres Gonzales Special Account, (Payroll Checks [Doc. #29-1]; Lopez Aff. ¶ 12 (averring that from 2005 to 2010 his father had between five and twenty employees and that at the time of his arrest he had "more like 20 employees")), the checks totaling nearly $90,000, compared to the $595,555 claimed as contract labor expenses for the year, (2010 Tax Return).  In addition, although Gonzalez purchased "significant quantities" of materials in cash, he bought "most" materials with credit cards. (Lopez Aff. ¶ 12.)

After accounting for business expenses and self-employment taxes, Gonzalez and his homemaker wife had an adjusted gross income ("AGI") in 2010 of $78,444. (2010 Tax Return; see also 2005 Tax Return (showing an AGI of

$9,118); 2006 Tax Return (showing an AGI of $21,493); 2008 Tax Return (showing an AGI of $34,320); 2009 Tax Return (showing an AGI of $62,545).) Gonzalez's business supported him, his homemaker wife, and their four dependent children. (See 2005-2010 Tax Returns.) The family's expenses in 2010 included mortgage payments of $18,000, (see Check to Wells Fargo Home Mortg. from Jose Joel-Torres Gonzalez, Sept. 27, 2010 [Doc. #22-4]), medical and dental expenses of $17,467, (2010 Tax Return), utility payments of $2,033.59 through October, (see Checks to Duke Energy from Jose Joel-Torres Gonzalez [Doc. #22-5]), charitable donations of $1,800, (2010 Tax Return), and $465 for tuition and pet care, (see Checks from Jose Joel-Torres Gonzalez and Jose J Torres Gonzalez Special Account [Doc. #22-6]). Although Gonzalez did not provide the Government an itemization of his household expenses for 2010, budget calculators from the United States Department of Agriculture for a family of six in the suburban south, the Massachusetts Institute of Technology for a family of five[7], and the Economic Policy Institute for a family of six in the Greensboro/High Point area each estimate that annual expenses for food, transportation, clothing, and other necessities exceed $20,000. (U.S. Dep't of Agric. Cost of Raising a Child Calculator [Doc. #22-9]; Mass. Inst. of Tech. Living Wage Calculation [Doc. #22-10]; Econ. Policy Inst. Family Budget Calculator [Doc. #22-11].) Finally, although

---

[7] Expenses for a family of six were apparently not available. (Pl.'s Br. in Supp. of Summ. J. at 7 n.6.)

Gonzalez and his wife likely did not make the payment in 2010, they owed $8,301 in federal taxes for 2010. (See 2010 Tax Return.)

III.

A.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[8]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id. This summary judgment standard applies in civil forfeiture actions. See, e.g., $864,400.00, 2009 WL 2171249, at *2 ("In essence, the analysis concerns whether the evidence presents a sufficient

---

[8] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.") (internal quotations omitted).

The Government alleges that the defendant currency is forfeitable pursuant to either (1) 21 U.S.C. § 881(a)(6) as money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substances Act or as proceeds traceable to such an exchange or (2) 18 U.S.C. § 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such an offense, the offense being the exchange of a controlled substance in violation of state or federal law. (Compl. ¶¶ 1, 2 [Doc. #1].)

The burden of proof is on the Government to establish by a preponderance of the evidence that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). Notably, although Gonzalez argues that "specifically the government must establish that there was a 'substantial connection' between the property sought to be forfeited and the criminal offense," (Br. in Opp'n to Pl.'s Mot. for Summ. J. at 6), that burden is inapplicable here. Section 881(a)(6) of Title 21 provides that property subject to forfeiture includes:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

The Government is not arguing that the currency seized at Gonzalez's residence was involved in, used in, or facilitated the drug sale on November 16, 2010, nor could it do so successfully in light of the evidence, (see Torres-Gonzalez, 741 S.E.2d at 505-06).  Instead of arguing that the seized currency was used or intended to be used to facilitate the November 16, 2010 offense, the Government argues that the seized currency was intended to be furnished in exchange for drugs in other transactions or was proceeds from previous drug transactions.  As a result, the Government does not need to establish a substantial connection between the seized currency and the November 16, 2010 drug sale. See 18 U.S.C. § 983(c)(3) (requiring the Government to establish a substantial connection between the property and the criminal offense).

The Government may rely on circumstantial evidence to establish forfeitability, United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010), and the "[p]roceeds need not be tied to any particular identifiable drug transaction", United States v. 998 Cotton St., Forsyth Cty., No. 1:11-CV-356, 2013 WL 1192821, at *13 (M.D.N.C. Mar. 22, 2013).  It is the examination of the totality of the circumstances that determines whether the Government has met its burden. United States v. $98,669.60 in U.S. Currency, No. 5:13-CV-585-D, 2017 WL 750701, at *15 (E.D.N.C. Feb. 23, 2017) (citing United States v. Thomas, 913 F.2d 1111, 1115 (4th Cir. 1990)).  For example, "[i]nsufficient legitimate income to explain expenditures, along with evidence of drug trafficking, is evidence of property derived illegally." 998 Cotton St., 2013 WL 1192821, at *13 (citing, among other

cases, Thomas, 913 F.2d at 1114 and explaining that, although Thomas was decided prior to the enactment of CAFRA, Thomas remains relevant "because factors that weighed in favor of forfeiture in the past continue to do so post-CAFRA, although subject to the higher [preponderance of the evidence] burden); see also $147,900.00, 450 App'x at 264 (citing and quoting United States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003) as "holding that 'evidence of legitimate income that is insufficient to explain the large amount of property seized' satisfies the preponderance of the evidence standard"). Likewise, "possession of large sums of cash at the same time as . . . engagement in drug activity provides 'strong evidence that the cash is connected with drug activity.'" $147,900.00, 450 App'x at 264; see also Thomas, 913 F.2d at 1115 (noting that "the possession of unusually large amounts of cash . . . may be circumstantial evidence of drug trafficking").

Here, the totality of the circumstances and the undisputed evidence support the conclusion that the Government has met its burden. First, Gonzalez was convicted of felony conspiracy to traffic in cocaine after having participated in the events of November 16, 2010 during which Blanco sold cocaine[9] that he had retrieved from Gonzalez's house. Sometime around midnight that night, a search conducted at Gonzalez's house revealed $115,471[10] in cash found in a kitchen

---

[9] The deal was for the sale of fifteen ounces, about 425 grams, of cocaine for $18,000.

[10] See supra n.3.

cabinet, in his master bedroom, and under his bed, among two cardboard boxes with fifteen bundles of money, a paper bag with seven envelopes of money, two individual envelopes containing more cash, and Gonzalez's wallet. In addition, law enforcement found triple-beam scales in the residence. Canine Bo alerted both to the left front corner of Gonzalez's bed and to the seized currency.

Although Gonzalez argues that circulated currency "is mostly contaminated with cocaine in light of pervasive use of that drug in this country[] so that the canine alert cannot be conclusively probative (actually not probative at all) of drug presence in the house" and cites to cases outside the Fourth Circuit from the 1990's, (Br. in Opp'n to Pl.'s Mot. for Summ. J. at 9), the Supreme Court more recently determined that an alert by a properly trained canine is entitled to a presumption of reliability, Florida v. Harris, 568 U.S. 237, 133 S. Ct. 1050, 1057 (2013) (finding that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert"). See also $98,699.60, 2017 WL 750701, at *18 (acknowledging that some courts in the 1990's questioned the validity of a dog alert, but explaining that recently courts have accepted scientific evidence that "dogs do not alert to innocently tainted currency in general circulation but only to currency that 'has been exposed to large amounts of illicit cocaine within the very recent past'" because they are alerting "to volatile odors from illegal narcotics that dissipate quickly over time"); United States v. $200,000 in U.S. Currency, 210 F. Supp. 3d 788, 795 (M.D.N.C. 2016) (citing and quoting Harris and evaluating the relevant canine's training and

13

certification) appeal filed sub nom. United States v. Damian Phillips, No. 16-2358 (4th Cir. 2016). According to his partner Corporal Stanley, "Canine Bo is a Dutch Shepherd, a breed specifically selected for their keen senses and ability to be trained to detect the odor of narcotics." (Stanley Decl. ¶ 1.) Canine Bo was initially certified in September 2010, two months prior to his alert inside Gonzalez's house and to the seized currency, with the North American Police Work Dog Association. (Id.) Since then, he has been recertified every year by the same organization. (Id.) As such, Canine Bo's alerts to Gonzalez's bed and the seized currency are presumed reliable, and Gonzalez has offered no evidence to rebut the presumption.

Next, although Gonzalez's drywall and paint business had significant gross receipts, particularly in 2010, the business's steep expenses drained it, and consequently Gonzalez, of most of its income. While Gonzalez's adjusted gross income for 2010 of $78,444 was greater than in previous years, it was, as the Government describes, modest for a family of six with expenses that have been conservatively estimated to be at least $60,000, not including the $8,301 that Gonzalez owed in federal taxes for the year.

Next, Gonzalez maintained bank accounts from which he paid personal and business expenses belying the likelihood that he needed to keep over $100,000 of cash on hand for accounts payable. He paid his mortgage and utilities from an account in the name of Jose Joel-Torres Gonzalez and other personal and business expenses, including employee payroll at least in part, from an account in the name

of Jose J Torres Gonzalez Special Account.  Gonzalez's son acknowledged that, even though his father bought significant quantities of supplies in cash, he purchased most of his materials with credit cards.  Those credit cards, along with most of the other business expenses, including at least insurance, interest, legal and professional services, equipment leases, taxes, and utilities, were more than likely not paid in cash.  While the payroll checks written throughout 2010 to thirteen of the approximate twenty employees total nearly $90,000 compared to the $595,555 in contract labor expenses that Gonzalez claimed in 2010, the checks are evidence that some labor expenses were not paid in cash.

In sum, the totality of the circumstances, including the undisputed evidence of Gonzalez's conviction for felony conspiracy to traffic in cocaine, the narcotics alerts on the corner of his bed and the seized currency by a certified canine, the location and storage of $115,471 in cash in Gonzalez's home, Gonzalez's maintenance and use of bank accounts for personal and business expenses, and modest adjusted gross income to support a family of six considering the family's expenses, show that it is more likely true than not that the $115,471 in U.S. currency seized from Gonzalez's residence was furnished or intended to be furnished in exchange for a controlled substance, was proceeds traceable to such an exchange, or was money constituting or derived from proceeds traceable to specified unlawful activity which includes the exchange of a controlled substance in violation of state or federal law.

B.

Because the Government has met its burden, Gonzalez may argue, as he seems to do here, that he is an innocent owner of the subject property, but he must prove this defense by a preponderance of the evidence. 18 U.S.C. § 983(d)(1). In support of this contention, his son avers and submits evidence that the seized currency consists of proceeds from Gonzalez's drywall and paint business. Thus, pursuant to 18 U.S.C. § 983(d)(3)(A), Gonzalez appears to argue that he acquired his property interest after the conduct giving rise to the forfeiture. In other words, the currency was tainted with the odor of narcotics prior to Gonzalez's receipt of the cash. He is considered an innocent owner in this context if, at the time that he acquired the interest in the property, he was a bona fide purchaser or seller for value (including a purchaser or seller of goods or services for value) and did not know and was reasonably without cause to believe that the property was subject to forfeiture. Id. Certainly, Gonzalez argues as much, but he does not meet his burden of showing by a preponderance of the evidence that he is an innocent owner.

Conspicuously, although not required to do so, Gonzalez does not himself submit an affidavit or declaration in support of his argument that he is the innocent owner of the defendant currency. Instead, his son, Joel Gonzalez Lopez, Jr., who was "fully familiar with the way in which [his] father's business operated" in 2010, submitted an affidavit on his father's behalf. (Lopez Aff. ¶ 3.) He "was completely familiar with the books and records, the finances, the handling of money, the way

16

in which the business was carried out, the relationships and payment of the employees, the payment by the persons for whom [they] did business, and all other aspects of the business." (Id.)  He actively assisted his father with the business and, after his father was imprisoned, took over the business. (Id.)  He avers that he is "fully satisfied, based on [his] familiarity with the operations of the business, that the entire $115,471.00 seized from [the] home on November 17, 2010, consisted of proceeds" from his father's drywall and paint business. (Id. ¶ 6.)  Specifically, he states that the proceeds were "receipts [from persons and companies for whom JTG Drywall & Paint had done work and provided materials] that had not yet been expended". (Id.)

Lopez avers that his father's business had "many customers, many of whom were companies which did repeat business, and some of whom were individual homeowners." (Id. ¶ 8.)  In support of this assertion, Lopez attaches copies of 1099's issued by repeat business customers from 2005 to 2010 that he was able to locate. (Id. & Ex. 1.)  These companies "ordinarily" paid by check, while homeowners paid in cash. (Id. ¶ 8.)  His father "had a standard practice . . . with respect to the checks paid him by the companies". (Id. ¶ 9.)  "Sometimes" he would take the customer's check to the bank, "cash the check," "keep some of the cash," and "deposit some of the cash." (Id.)  Lopez attaches bank deposit slips that he was able to locate from 2005 to 2010 that "reflect[]" "[t]hese transactions". (Id. & Ex. 2.)  In further support, Lopez offers a chart listing various dates and dollar figures corresponding to bank deposits during 2008 that he

considers to be "[e]xamples of notations by [Gonzalez] on some of these bank deposits showing the gross amount of the check cashed, and the amount that was deposited". (Id. ¶ 10.) "Otherwise, and more frequently, [Gonzalez] would cash the customer's check, usually at the customer's bank, and keep all of the amount paid as cash." (Id. ¶ 9.) Lopez also attaches "a number of the check stubs from payments [his] father received from his customers", but they "represent only a few of the check stubs during the years 2005 to 2010." (Id. ¶ 11 & Ex. 3.)

As for Gonzalez's business expenses, according to Lopez, at the time of his father's arrest, the business employed "more like 20 employees" whom his "father always paid . . . in cash." (Id. ¶ 12.) His employees earned between $25,000 and $40,000 per year, "[a]ll of [which] was paid in cash by [Gonzalez]." (Id.) Gonzalez "bought most of his materials with credit cards, but he bought significant quantities in dollar amounts of materials with cash." (Id.)

The Government does not dispute that Gonzalez's business had significant gross receipts in 2010 and, thus, argues that Lopez's evidence of those receipts, including the 1099's and check stubs, is immaterial. (Pl.'s Reply Br. at 2-3 [Doc. #29].) The Government also does not dispute the accuracy of Gonzalez's tax returns, which it acknowledges show the business's gross receipts, expenses including labor, and profits. (Id. at 3, 4.) Neither Lopez nor Gonzalez dispute the Government's calculation, presentation, or evidence of Gonzalez's personal expenses. Thus, neither the Government nor Gonzalez disputes the gross proceeds

from his business, his business and personal expenses, or his personal adjusted gross income.

The disputes rest on Lopez's averments that the seized currency was essentially cash that Gonzalez obtained when he cashed his customers' checks, that he paid all of his likely 20 employees in cash, each of whom earned between $25,000 and $40,000 per year, and that he purchased significant quantities of materials in cash (while also buying most of his materials with credit cards). But, these disputes are not genuine, as a reasonable jury could not find in favor of Gonzalez based on the evidence.

While Lopez offers a chart explaining various notations on some deposit slips in 2008 to illustrate his father's practice of depositing less than the gross amount of a check, he does not explain how he knows that the notations he specifies are his father's, or that the numerical notations represent the gross check amount, or why notations on other deposit slips are distinguishable and, hence, not included in the chart, or why notations on deposit slips from 2008 support the conclusion that his father had over $100,000 in cash in November 2010, other than his conclusory and vague statement that deposit slips from other years "reveal patterns consistent" with the 2008 deposit slips. The same problems with the chart of selected 2008 deposit slips are evident with the other attached deposit slips. There is no way to determine the gross amount of a particular check to show the amount of cash back that Gonzalez received. Sometimes there are numerical

notations, but there is no way to know what they represent or who made them or how many different people made them.

Despite Lopez's repeated statements to the contrary, Gonzalez did not pay all of his employees in cash. The Government submitted copies of over 150 paychecks from Gonzalez to thirteen different employees throughout 2010 until his arrest in November. While the checks total nearly $90,000, significantly less than the $595,555 that Gonzalez attributed to "contract labor" expenses in his 2010 Tax Return, they are evidence that Gonzalez did not pay all of his employees in cash.

Although Lopez avers that his father purchased significant quantities of materials with cash, he acknowledges that his father bought most of his materials with credit cards. A review of Gonzalez's tax returns shows other business expenses that, more likely than not, Gonzalez also did not pay in cash, including insurance, legal and professional services, office expenses, equipment leases, taxes and licenses, and utilities. Despite Lopez's speculative assertion that the entire[11] $115,471 in cash was proceeds from his father's business that had not yet been spent, Gonzalez has submitted no evidence to support such a conclusion. It is more likely true than not that Gonzalez would not have $115,471 in uncommitted legitimate cash revenues in mid-November 2010.

---

[11] Gonzalez makes no argument that any amount less than the entire $115,471 was from his legitimate business.

In sum, Gonzalez has not met his burden by a preponderance of the evidence that he is the innocent owner of the seized currency.  As a result, because the undisputed evidence supports the conclusion that the Government showed by a preponderance of the evidence that the seized currency was either money furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, or money constituting or derived from proceeds traceable to specified unlawful activity which includes the exchange of a controlled substance in violation of state or federal law, summary judgment in the Government's favor is appropriate.

IV.

For the reasons stated herein, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. #21] be GRANTED.

This the 3 d day of July, 2017.


                                        /s/ N. Carlton Tilley, Jr.
                                 Senior United States District Judge